# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**DAMION O'NEILL,**

**Plaintiff,**

**v.**

**ADAMS COUNTY JAIL, et al.,**

**Defendants.**

Case No. 1:23-cv-200

**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Deavers**

## OPINION AND ORDER

Plaintiff Damion O'Neill alleges Adams County Sheriff Kimmy Rogers,[1] Adams County Jail Administrator Lieutenant Hayslip, and various other Adams County Jail (the Jail) employees (Mike Perigo, Mike Shamblin, Paul, Aemeont, "Big John,"[2] and Unknown Jane Doe Nurse) (collectively, Defendants) violated his civil rights during his pretrial detention at the Jail. (Doc. 20). He alleges Defendants confined him to an isolation cell in which part of the ceiling collapsed on him; denied him sanitary eating utensils, personal hygiene items, food, and medical care; fed him a diet of pop tarts (which he says contain pork, which he cannot eat because he is Muslim) and cheese

---

[1] In his operative complaint, O'Neill refers to Sheriff Rogers as "Kinney" Rogers. (Third. Am. Compl., Doc. 20, #77). But the Ohio Attorney General maintains a law enforcement directory on his website, and that site lists Sheriff Rogers' first name as Kimmy, not Kinney. *Law Enforcement Directory – Sheriffs*, Ohio Att'y Gen., https://perma.cc/EL5K-VUYC. The Court can take judicial notice of that information given it is posted on an official government website. *Epps v. United States*, No. 1:23-cv-510, 2024 WL 2176877, at *5 n.1 (S.D. Ohio May 15, 2024); Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). So the Court refers to Sheriff Rogers as Kimmy, not Kinney, in this Opinion and Order.

[2] O'Neill refers to this Defendant as "Big John" in the Third Amended Complaint. (Doc. 20, #79). He does not provide Big John's real name.

sandwiches; denied him access to a Qur'an and Islamic services; and forced him to sign a piece of paper stating he would convert to Christianity to receive adequate meal trays. (*Id.*).

The matter is now before the Court on O'Neill's Third Amended Complaint (Doc. 20), the Magistrate Judge's original, (R&R, Doc. 12), and supplemental, (Suppl. R&R, Doc. 22), Reports and Recommendations, and O'Neill's objections to the Supplemental R&R, (Doc. 23). For the reasons discussed below, the Court **REJECTS AS MOOT** the R&R (Doc. 12), **OVERRULES** O'Neill's Objections to the Supplemental R&R (Doc. 23), and **ADOPTS IN PART** the Supplemental R&R (Doc. 22). As a result, the Court **DISMISSES WITHOUT PREJUDICE** all of O'Neill's official-capacity claims. It also **DISMISSES WITHOUT PREJUDICE** O'Neill's individual-capacity claims arising because of his cell ceiling's falling on him, his alleged denial of a single meal, and the nature of the food he was provided. And it **DISMISSES WITHOUT PREJUDICE** all claims against Sheriff Rogers, except for O'Neill's individual-capacity claim against him based on his alleged extended refusal to give O'Neill personal hygiene items.

The Court explains, at the end, which claims remain after those dismissals.

# BACKGROUND[3]

## A.   Factual Background

O'Neill begins his now-operative Third Amended Complaint by making various allegations related to Defendants' behavior throughout his pretrial detention at the Jail. On that score, he first alleges that Paul (a corrections officer at the Jail), Aemeont (another corrections officer), and Hayslip (the Jail Administrator) placed him in isolation shortly after he arrived and kept him there until his transfer out of the Jail. (Doc. 20, #80–81, 83). Second, he says that, throughout his time at the Jail, each of the named Defendants refused to provide him with sanitary eating utensils or personal hygiene items such as razors and toothpaste. (*Id.* at #83–84). Third, he says Hayslip denied him access to a Qur'an and Islamic services. (*Id.* at #84). And he also says Hayslip, Paul, and Aemeont told him that he was allowed to attend only Christian services. (*Id.*).

O'Neill's next allegations arise from an injury he sustained in March 2023. (*Id.* at #82). According to his complaint, he completed several medical care slips disclosing that his finger was infected and had "turned purplish dark blue and swollen with puss [sic]." (*Id.* at #82). Yet after Jane Doe Nurse examined his finger, she returned

---

[3] The case comes before the Court on its sua sponte screening authority under the Prison Litigation Reform Act (PLRA), 28 U.S.C. §§ 1915(e), 1915A, which is governed by the same standards that apply to motions to dismiss for failure to state a claim. *Williams v. Parikh*, __ F. Supp. 3d __, 2023 WL 8824845, at *3 (S.D. Ohio 2023) (citing *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010)). Accordingly, the Court accepts the well-pleaded allegations in the Complaint as true at this stage. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). "But in reporting the background here based on those allegations, the Court reminds the reader that they are just that—allegations." *Jones v. City of Cincinnati*, No. 1:22-cv-530, 2024 WL 707288, at *1 n.3 (S.D. Ohio Feb. 21, 2024).

him to his cell without providing any medical care. (*Id.* at #82–83). Once he was back in his cell, Shamblin (another corrections officer) brought him "a fork and hand sanitizer" and told him to "take care of it how you would in your country." (*Id.* at #83).

O'Neill then alleges that, sometime between April 15, 2023, and April 18, 2023, Perigo (another corrections officer) denied him dinner on one occasion. (*Id.* at #81–82). Perigo allegedly explained this decision by claiming that the Jail was short on meals that day. (*Id.* at #81). Then, when O'Neill told Big John (another corrections officer) and Hayslip about Perigo's denying him a meal, they both said there was nothing to be done. (*Id.* at #82).

Also on the meal front, at some point "[p]rior to this incident[,] [Aemeont, Paul, and Hayslip] … altered Plaintiff's tray to [consist solely of] cheese sandwiches and pop tarts." (*Id.* at #82). The pop tarts allegedly contained pork, which violated O'Neill's dietary restrictions as a practicing Muslim. (*Id.*). And O'Neill alleges that Paul and Hayslip forced him "to sign a paper stating he would convert[] to Christianity so he would receive adequate food trays." (*Id.*).

Finally, O'Neill alleges that an 8–9-pound chunk of the ceiling in his cell fell and struck him on the head at some unspecified time. (*Id.* at #84). Big John removed the ceiling piece from his cell, told him to "be thankful the rhubarb [sic] didn't fall too,"[4] and allegedly never documented the incident. (*Id.*). Jane Doe Nurse allegedly denied O'Neill medical care as a result of this incident, though he has since received

---

[4] The Court believes "rhubarb" is best understood to be referring to rebar, the metal rods typically included in concrete walls to strengthen them.

medical care from other medical staff "for complaints of memory loss and issues regarding his balance." (*Id.*).

## B. Procedural History

Proceeding pro se, O'Neill filed his original Complaint on March 14, 2023, in the Adams County Court of Common Pleas. (Doc. 2, #19 (date stamp)). While that complaint was not the model of clarity, it appeared to include a demand for recovery based on Defendants allegedly violating O'Neill's constitutional rights. (*Id.* at #21 ("[T]his form shall serve as my Declaration to sue and [to] start litigation for … cruel and unusual punishment.")). Interpreting the claims as arising under § 1983, Defendants removed the case to this Court. (Doc. 1, #3). They then answered. (Doc. 4). After that, O'Neill moved (1) to amend his Complaint to add a claim, (Doc. 11, #38), and (2) to have the Court appoint counsel, (*id.*).

The Magistrate Judge granted the former request but denied the latter. (Doc. 12, #43–44). She also screened the First Amended Complaint[5] under the Prison Litigation Reform Act (PLRA), 28 U.S.C. §§ 1915(e), 1915A, which applies the same standard used to assess a motion to dismiss for failure to state a claim, *Williams v. Parikh*, __ F. Supp. 3d __, 2023 WL 8824845, at *3 (S.D. Ohio 2023) (citing *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010)). (*Id.* at #44–48). Based on that

---

[5] The Magistrate Judge treated the Motion to Amend (Doc. 11), combined with the Complaint (Doc. 2), as O'Neill's First Amended Complaint. (Doc. 12, #46). But there was no proposed Amended Complaint attached to the Motion to Amend and therefore no Amended Complaint was ever docketed in connection with the Motion to Amend. So that label is not strictly accurate. Still, to avoid confusion, the undersigned adopts the Magistrate Judge's label and refers to the combination of the Motion to Amend and the Complaint as the so-called First Amended Complaint.

5

screening authority, she issued the R&R.[6] (Doc. 12). There, she first found that the Jail itself is not an entity that can be sued and that, to the extent that O'Neill was instead suing the County (the governmental entity of which the Jail is a component part), O'Neill had failed to allege Defendants violated his constitutional rights pursuant to a policy attributable to their employer—an element of such a claim against a governmental entity under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (Doc. 12, #46–47). She then found that, because the Amended Complaint demanded no form of relief, it did not satisfy Federal Rule of Civil Procedure 8(a)(3). (Doc. 12, #47–48). Based on those shortcomings, she recommended that the Court dismiss the First Amended Complaint and give O'Neill 28 days in which to file a second amended complaint curing the deficiencies identified. (*Id.* at #48–49).

Rather than object to the R&R, O'Neill decided to amend his complaint to address the problems the Magistrate Judge identified. After the Magistrate Judge granted O'Neill's request for an extension in which to do so, (Doc. 14), O'Neill timely filed the Second Amended Complaint (Doc. 15). Defendants answered. (Doc. 16). The Magistrate Judge then entered a deficiency order identifying several deficiencies in the Second Amended Complaint and allowing O'Neill to amend his Complaint once more to address those further deficiencies. (Doc. 19, #74–76).

---

[6] The same docket entry, Doc. 12, addresses both non-dispositive (whether to allow leave to amend and whether to appoint counsel) and dispositive (dismissal) matters. So technically, it is an Order as to the former and an R&R as to the latter.

6

O'Neill accepted that invitation and filed his Third Amended Complaint—the now-operative complaint. (Doc. 20). The Third Amended Complaint names Rogers, Hayslip, Paul, Aemeont, Shamblin, Big John, Perigo, and Jane Doe Nurse as Defendants. (*Id.* at #77–80). And it states that it asserts claims under 42 U.S.C. § 1983 and *Monell*. (*Id.* at #85). In terms of relief, O'Neill seeks various forms of damages—"punitive damages," "reparations for the financial cost to feed himself when the jail would not provide adequate meals," and "compensation" for his "physical[,] emotional[,] and psychological trauma"—as well as "removal of [D]efendants from their positions" and "other appropriate injunctions." (*Id.* at #86).

The Magistrate Judge then screened the Third Amended Complaint and issued the Supplemental R&R. (Doc. 22). She construed the that complaint as bringing: (1) conditions-of-confinement claims based on O'Neill's placement in isolation, the falling ceiling, the jail staff's denial of sanitary utensils and personal hygiene items, its denying him one meal, and its decision to alter his meals to be cheese sandwiches and pop tarts; (2) deliberate-indifference-to-serious-medical-needs claims based on the jail staff's denying O'Neill medical care for the injuries to his hand (the infection) and head (the concrete falling); and (3) First Amendment claims based on the jail staff's denying O'Neill access to a Qur'an and Islamic services, serving him items containing pork, and making him promise to convert to Christianity. (*Id.* at #101). And she construed each claim as being asserted against each Defendant who was allegedly involved in the associated incident in both his individual and official capacities. (*Id.* at #101 n.3).

7

Of those claims, the Magistrate Judge recommended allowing the following claims to proceed: (1) the individual- and official-capacity conditions-of-confinement claims against Hayslip, Paul, and Aemeont based on their placing O'Neill in extended isolation; (2) the individual- and official-capacity deliberate-indifference claims against Jane Doe Nurse and Shamblin for denying O'Neill care for his injured finger; (3) the individual- and official-capacity deliberate-indifference claims against Jane Doe Nurse and Big John for denying O'Neill care for his head injury; (4) the individual- and official-capacity First Amendment claims against Hayslip for denying O'Neill a Qur'an; and (5) the individual- and official-capacity First Amendment claims against Hayslip, Paul, and Aemeont for denying O'Neill religious services, serving him food containing pork, and making him promise to convert to Christianity. (*Id.* at #102–03). She recommended dismissing the remaining claims with prejudice. (*Id.* at #109–10). And she also recommended adopting the original R&R wholesale. (*Id.* at #110).

O'Neill timely objected. (Doc. 23). He contends the Magistrate Judge misunderstood some of the facts. (*Id.* at #113, 115). He also argues that the Court should not dismiss Sheriff Rogers from the Complaint because Rogers knew about the housing conditions at the Jail. (*Id.* at #113). And he claims Defendants are unfairly using the Federal Rules of Civil Procedure against him. (*Id.* at #115 ("Plaintiff … believes the defendants moved to have this matter heard in this Honorable Court for the sole purpose of having it die on federal procedure. Plaintiff

[o]bjects to the Dismissal of any Defendant, because all have contributed to the injury and discrimination suffered by the Plaintiff.")).

These matters are now ripe for review.

## LEGAL STANDARD

"Under Federal Rule of Civil Procedure 72(b)(3), district courts review an R&R de novo after a party files a timely objection. But that review extends only to any portion to which a proper objection was made." *Canter v. Alkermes Blue Care Elect Preferred Provider Plan*, No. 1:17-cv-399, 2024 WL 2698405, at *4 (S.D. Ohio May 24, 2024) (cleaned up). In response to such an objection, "the district court may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." *Id.* (cleaned up). If a party makes only a general objection, on the other hand, that "has the same effect[] as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). "A litigant must identify each issue in the R&R to which he objects with sufficient clarity, or else forfeit the Court's de novo review." *Canter*, 2024 WL 2698405, at *4 (citing *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995) ("The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious.")).

That said, O'Neill is proceeding pro se. Pro se litigants' pleadings are to be construed liberally and are subject to less stringent standards than formal pleadings filed by attorneys. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Franklin v. Rose*, 765 F.2d 82, 84–85 (6th Cir. 1985). But pro se litigants still must comply with the

procedural rules governing civil cases. *McNeil v. United States*, 508 U.S. 106, 113 (1993). And "[t]he liberal treatment of pro se pleadings does not require the lenient treatment of substantive law." *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010) (citations omitted).

For unobjected portions of the R&R, "the advisory committee notes to Federal Rule of Civil Procedure 72(b) suggest that the Court still must 'satisfy itself that there is no clear error on the face of the [R&R] … to accept the recommendation.'" *Redmon v. Noel*, No. 1:21-cv-445, 2021 WL 4771259, at *1 (S.D. Ohio Oct. 13, 2021) (collecting cases).

Finally, the Court is reviewing the Complaint under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, which permit sua sponte dismissals for failure to state a claim upon which relief may be granted. Because such dismissals are governed by the same standard that applies to motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), *Hill*, 630 F.3d at 470–71, the motion-to-dismiss standard also comes into play here.

To survive a motion to dismiss for failure to state a claim, a "complaint must present sufficient facts to 'state a claim to relief that is plausible on its face.'" *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While a 'plausible' claim for relief does not require a showing of probable liability, it requires more than 'a sheer possibility that a defendant has acted unlawfully.'" *Brave Optical, Inc. v. Luxottica of Am., Inc.*, No. 1:23-cv-793, 2024 WL 3173504, at *3 (S.D. Ohio June 26, 2024) (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In other words, a plaintiff must provide a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* (cleaned up).

To meet this pleading standard, a complaint must contain "either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 275–76 (6th Cir. 2010) (citation omitted). And "conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Id.* at 276 (cleaned up). In short, an action will be dismissed where "there is no law to support the claims made" or "the facts alleged are insufficient to state a claim." *Stew Farm, Ltd. v. Nat. Res. Conservation Serv.*, 967 F. Supp. 2d 1164, 1169 (S.D. Ohio 2013).

In making that determination, the Court "construe[s] the complaint in the light most favorable to the plaintiff, draw[s] all reasonable inferences in its favor, and accept[s] all well-pleaded allegations in the complaint as true." *Keene Grp., Inc. v. City of Cincinnati*, 998 F.3d 306, 310 (6th Cir. 2021). But that does not mean the Court must take everything plaintiffs allege at face value, no matter how unsupported. The Court may disregard "naked assertions" of fact or "formulaic recitations of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (cleaned up). And it has limited scope to consider materials outside the pleadings. *Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023) ("Generally, in considering a motion to dismiss, the district court is confined to considering only the pleadings ... . However, the court may, in undertaking a 12(b)(6) analysis, take judicial notice of

matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint [so long as they meet the strictures of Federal Rule of Civil Procedure 10(c)]." (cleaned up)).

## LAW AND ANALYSIS

The Court begins by addressing the Complaint, the First Amended Complaint, the R&R (which screened the First Amended Complaint), and the Second Amended Complaint. Finding those moot, it then turns to the Third Amended Complaint and the Supplemental R&R, the latter of which it adopts in part.

### A. The Complaint, First Amended Complaint, the Second Amended Complaint, and the R&R

The Complaint, First Amended Complaint, Second Amended Complaint, and original R&R are all moot. That is because each successive version of the complaint rendered the immediately preceding version moot. *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306–07 (6th Cir. 2000); *Green v. Mason*, 504 F. Supp. 3d 813, 826 (S.D. Ohio 2020) ("As a general matter, an amended complaint supersedes the original complaint." (cleaned up)). In other words, "[w]hen [O'Neill] filed the First Amended Complaint, [he] mooted the Complaint." *Epps v. United States*, No. 1:23-cv-510, 2024 WL 2176877, at *3 (S.D. Ohio May 15, 2024). The Second Amended Complaint then mooted the First Amended Complaint. *Jones v. Ohio Dep't of Pub. Safety*, No. 2:22-cv-3692, 2024 WL 495529, at *1 n.3 (S.D. Ohio Feb. 7, 2024) ("[T]he second proposed amended complaint ... supersedes the first proposed amended complaint and controls the case from the time it is filed."). "As a result, the []R&R screening the [First Amended] Complaint is also moot." *Epps*, 2024 WL 2176877, at

12

*3. (The Court therefore rejects the Supplemental R&R's recommendation that it adopt the R&R. (Doc. 22, #109).) And the Third Amended Complaint, in turn, mooted the Second Amended Complaint. So the case is now before the Court on just the Third Amended Complaint, the Supplemental R&R, and O'Neill's objections to the Supplemental R&R.

## B. The Third Amended Complaint and the Supplemental R&R

With those preliminary matters out of the way, the Court turns to the Third Amended Complaint. The Court begins by reviewing O'Neill's official-capacity claims, followed by his individual-capacity claims.[7] It then concludes by addressing O'Neill's argument that Rogers, as the highest-ranking official at the Jail, is ultimately responsible for conditions at the Jail.

### 1. The Official-Capacity Claims

"[I]ndividuals sued in their official capacities stand in the shoes of the entity they represent." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). Accordingly, "[a] suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing *Will v. Mich. Dep't of State Police*,

---

[7] Defendants reserve a defense of failure to exhaust administrative remedies under the PLRA. (Doc. 21, #89). But "[f]ailure to exhaust administrative remedies is an affirmative defense under the PLRA that the defendant bears the burden of establishing." *Clark v. Owens*, No. 22-1276, 2022 WL 19396680, at *2 (6th Cir. 2022). And "courts generally cannot grant motions to dismiss on the basis of an affirmative defense unless the plaintiff has anticipated the defense and explicitly addressed it in the pleadings." *Est. of Barney v. PNC Bank, Nat'l Ass'n*, 714 F.3d 920, 926 (6th Cir. 2013) (cleaned up). So the Court does not consider exhaustion now. Should Defendants later establish that O'Neill's claims are unexhausted, however, those claims would be subject to dismissal without prejudice. *See Hamilton v. Wellman TD*, No. 1:23-cv-173, 2024 WL 1256196, at *3 (S.D. Ohio Mar. 25, 2024).

491 U.S. 58, 68 (1989)). "Any claim against … [any defendant] in [his] official capacit[y], then, is the equivalent of suing [Adams] County—[his] employer—as a governmental entity." *Dillon v. Hamlin*, __ F. Supp. 3d __, 2024 WL 707289, at *4 (S.D. Ohio 2024).

A viable § 1983 claim against a governmental entity such as Adams County must allege (1) a constitutional violation, which (2) was directly caused by that governmental entity's policy or custom. *Hardrick v. City of Detroit*, 876 F.3d 238, 243 (6th Cir. 2017). As to the latter, "[t]here are at least four avenues a plaintiff may take to prove the existence of a [governmental entity]'s illegal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). A plaintiff may prove that a defendant has an actionable, unconstitutional "policy" or "custom" in place by demonstrating: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision[-]making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas*, 398 F.3d at 429).

As explained below, O'Neill has not adequately alleged an actionable policy under any of the four available pathways. As a result, none of O'Neill's official-capacity claims survive PLRA screening.

### a.    Official Policy

Start with the first avenue *Thomas* outlines: the existence of an official, illegal policy. "To survive a motion to dismiss based on that theory, [O'Neill] needs to allege

14

facts that point towards a policy or custom that forms the basis of his claim. But the [Third Amended] Complaint cites no facts suggesting that a specific, official policy of [Adams County] … led to [his] injuries." *Stager v. Hanshaw*, No. 1:23-cv-120, 2024 WL 1556708, at *4 (S.D. Ohio Apr. 10, 2024) (cleaned up). In fact, the Third Amended Complaint does not even contain the words "custom" or "policy." So O'Neill cannot support his official-capacity § 1983 claims on that basis.

### b.    Ratification

The second avenue does not work, either. The Third Amended Complaint names two Defendants who are senior officials at the Jail: Rogers and Hayslip. But O'Neill has not plausibly alleged ratification as to either one.

"The Sixth Circuit recognizes two methods for finding ratification: (1) when an individual with policymaking authority issues a final decision affirming a subordinate's decision[,] … thereby adopting it as [governmental] policy, and (2) when a policymaker fails to meaningfully investigate the acts of a subordinate." *Meyers v. Cincinnati Bd. of Educ.*, 343 F. Supp. 3d 714, 729 (S.D. Ohio 2018); *see also Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020) ("A plaintiff can establish [governmental] liability by showing that the [governmental entity] ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct."); *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) ("Ratification of a subordinate's action requires more than acquiescence—it requires affirmative approval of a particular decision made by a subordinate."). For ratification purposes, whether policymaking authority exists is

15

a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) ("[T]he identification of policymaking officials is a question of state law. 'Authority to make [governmental] policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.'" (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion))).

The Adams County Sheriff has final authority over the Adams County Jail. Ohio Rev. Code § 341.01 ("The sheriff shall have charge of the county jail and all persons confined therein. He shall keep such persons safe, attend to the jail, and govern and regulate the jail according to the minimum standards for jails in Ohio … ."). Rogers is therefore an official with final decision-making authority under Ohio law. But O'Neill never alleges that Rogers issued any final decisions, failed to investigate misconduct, or otherwise ratified his subordinates' decisions. And O'Neill's allegations that Rogers knew of inhumane conditions, (Doc. 20, #80), in addition to being vague and conclusory, show, at most, mere "acquiescence." *Feliciano*, 988 F.2d at 656. As such, O'Neill's allegations against Rogers do not support a ratification theory.

O'Neill's allegations against Hayslip likewise do not plausibly amount to ratification. Because Ohio law vests Rogers with final decision-making authority, whether Hayslip has final decision-making authority (and thus could act as a ratifier for § 1983 purposes) depends on whether Rogers has delegated such authority to him. And "[a]lthough it is true that final policymaking authority may be

delegated, … mere authority to exercise discretion while performing particular functions does not make a [governmental] employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 814 (6th Cir. 2005) (cleaned up).

None of O'Neill's allegations allow the Court to draw a reasonable inference that Hayslip's decisions are "final and unreviewable." True, O'Neill says that he "requested to speak with a supervisor [about being denied a meal tray], and Lieutenant Hayslip responded" (i.e., arrived at his cell in response to that request). (Doc. 20, #81). But that at most gives rise to a reasonable inference that Hayslip "exercise[d] discretion" in administering meal tray distribution—not an inference that his decisions were "final and unreviewable." *Miller*, 408 F.3d at 814 (cleaned up). The same is true of O'Neill's allegations that Hayslip housed him in an isolation cell, (Doc. 20, #83), and denied him access to a Qur'an and Islamic religious services, (*id.* at #84). Those allegations simply do not suggest that Hayslip had final decision-making authority. O'Neill therefore has not put forth any allegations giving rise to a "reasonable inference[]," *Keene Grp.*, 998 F.3d at 310, that Hayslip was a final policymaker. *Cf. Cady v. Cumberland Cnty. Jail*, No. 2:10-cv-512, 2013 WL 3967486, at *21, *39 (D. Me. Aug. 1, 2013) ("The Sheriff of Cumberland County has final decision[-]making authority with respect to all policy and operational matters at the Cumberland County Jail. … Maine law and the facts presented by the parties do not support a finding that county jail administrators have 'final policy-making authority'

17

for jail matters."). So O'Neill cannot rely on a ratification theory based on his allegations against Hayslip, either.

### c.     Failure to Train

O'Neill likewise does not satisfy the third avenue *Thomas* outlined. "A failure-to-train claim ... requires a showing of prior instances of unconstitutional conduct demonstrating that the governmental entity had ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Burgess*, 735 F.3d at 478 (cleaned up). To meet that burden, "a plaintiff must do more than prove that a single officer was improperly trained or out of control, even if the County had been aware of past complaints against that particular officer." *Stager*, 2024 WL 1556708, at *6 (cleaned up). The problem for O'Neill is that he has not put forth any non-conclusory allegations of past complaints against *any* of the Defendants, let alone allegations showing a history of abuse that put (or ought to have put) Adams County on notice that its training or supervision of jail officials were inadequate. For example, his vague and conclusory assertion that "Sheriff Rogers knew that inmates house in the jail were subjected to inhumane conditions of confinement" is not enough. (Doc. 20, #80). So none of O'Neill's official-capacity § 1983 claims can clear the PLRA screening hurdle based on an inadequate training or supervision theory.

### d.     Inaction

The same is true of the fourth and final avenue *Thomas* describes. The "inaction theory," under which "a policy of tolerating federal rights violations is

unwritten but nevertheless entrenched," has four elements. *Thomas*, 398 F.3d at 429. To prevail on that theory, a plaintiff must show: (1) "a clear and persistent pattern" of rights violations; (2) "notice or constructive notice on the part of the defendant"; (3) "the defendant's tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) a causal link between the custom and the constitutional deprivation. *Id.* "Although the third and fourth elements differ from a failure-to-train claim and the 'inaction' theory encompasses things other than inadequate training, such as inadequate after-the-fact investigations, … [p]laintiffs bringing either type of claim must show (1) a history of rights violations such that (2) the defendants were on notice." *Stager*, 2024 WL 1556708, at *6. So O'Neill falls short on the "inaction" theory for the same reasons he falls short on the failure-to-train theory: "he has plausibly alleged neither a clear pattern of rights violations nor notice." *Id.*

\*     \*     \*

In short, O'Neill has not put forth "either direct or inferential allegations" that allow the Court to infer the existence of an Adams County policy that caused his claimed injuries. *Terry*, 604 F.3d at 275–76 (citation omitted). And because the existence of such a policy is a "material element[]" of any official-capacity claims, which are really claims against the County, O'Neill's official-capacity claims do not clear the PLRA screening hurdle. *Id.* at 276 (citation omitted). So the Court rejects the Supplemental R&R's recommendation that it allow certain official-capacity claims to proceed. (Doc. 22, #109–10). But the Court dismisses the official-capacity

claims without prejudice because O'Neill might be able to remedy these deficiencies by pleading additional facts. *Newberry v. Silverman*, 789 F.3d 636, 646 (6th Cir. 2015) ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear ... that the complaint could not be saved by amendment." (cleaned up)). "Moreover, dismissal without prejudice is particularly appropriate where, as here, a litigant is proceeding pro se and thus lacks knowledge of pleading requirements." *Epps*, 2024 WL 2176877, at *6 (citing *Brown v. Matauszak*, 415 F. App'x 608, 614–15 (6th Cir. 2011)).

### 2.    The Individual-Capacity Claims

The Court turns next to O'Neill's various individual-capacity claims. The Magistrate Judge correctly construed the Third Amended Complaint as raising conditions-of-confinement claims, deliberate-indifference-to-medical-need claims, and First Amendment claims. The Court considers each category of claims in turn.

### a.    Conditions-of-Confinement Claims

Start with the conditions-of-confinement claims. "The Fourteenth Amendment applies to conditions-of-confinement claims brought by pretrial detainees." *Bensfield v. Murray*, No. 4:21-cv-P104, 2022 WL 508902, at *2 (W.D. Ky. Feb. 18, 2022) (citing *Brawner v. Scott Cnty.*, 14 F.4th 585, 591 (6th Cir. 2021)). The standard for such claims has two components. The first component, sometimes called the objective component, requires a plaintiff to "show that [he] is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (cleaned up). And the second component, sometimes called the subjective component, requires a plaintiff to show

20

that a defendant "acted 'deliberately' and 'recklessly "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.""" *Id.* (quoting *Brawner*, 14 F.4th at 596).

O'Neill alleges that: (1) Hayslip, Paul, and Aemeont placed him in isolation housing for his entire time at the Jail; (2) all Defendants denied his requests for personal hygiene items throughout his incarceration; (3) Hayslip, Paul, and Aemeont put him in a cell in which part of the ceiling fell on him; (4) on one occasion, Perigo denied him a dinner tray when the Jail was short on food; and (5) Hayslip, Paul, and Aemeont fed him nutritionally inadequate meals consisting of cheese sandwiches and pop tarts. The Supplemental R&R concluded that the claim for extended isolation housing clears the PLRA screening hurdle and recommends that the Court deny the remaining four. The Court agrees with the first recommendation and agrees with almost all the second: the only distinction being that, unlike the Supplemental R&R, the Court concludes that the personal-hygiene-item claim may proceed.

### i.   *Isolation Housing*

The Court agrees with the Supplemental R&R that O'Neill may proceed on his individual-capacity conditions-of-confinement claim based on his extended stint in isolation housing. (Doc. 22, #109–10). "[I]t is well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee." *United States v. Basciano*, 369 F. Supp. 2d 344, 352 (E.D.N.Y. 2005) (citing Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change

477, 531 (1997) ("Direct studies of the effects of prison isolation have documented a wide range of harmful psychological effects[.] … There is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects."). Alleging 264 days of isolation housing is therefore enough to satisfy the objective component—substantial risk of serious harm—at this stage. And by making an affirmative choice to place O'Neill in extended isolation housing, Hayslip, Paul, and Aemeont acted "deliberately" in the face of this risk (which should have been obvious to them as prison officials). That is enough to satisfy the subjective component at this stage. O'Neill may therefore move forward with his first conditions-of-confinement claim.

### ii.    *Denial of Personal Hygiene Items*

The Court disagrees, however, with the Supplemental R&R's recommendation that it dismiss O'Neill's claims based on his being denied personal hygiene items. (Doc. 22, #105–06, 109–10). "Conditions-of-confinement cases are highly fact-specific, but one guiding principle is that the length of exposure to the conditions is often paramount." *Lamb v. Howe*, 677 F. App'x 204, 209 (6th Cir. 2017). "Short term deprivations of toilet paper, towels, sheets, blankets, mattresses, toothpaste, toothbrushes and the like do not rise to the level of a constitutional violation." *Gilland v. Owens*, 718 F. Supp. 665, 685 (W.D. Tenn. 1989). But the complete denial of personal hygiene products for a long period of time can support a conditions-of-confinement claim. *Compare Flanory v. Bonn*, 604 F.3d 249, 255–56 (6th Cir. 2010) (holding that allegations that an inmate was deprived of toothpaste for 337 days and

22

experienced serious dental health problems were enough to state a claim in the related Eighth Amendment context), *with Siller v. Dean*, 205 F.3d 1341, 2000 WL 145167, at *2 (6th Cir. 2000) (table) (holding that the denial of "access to a shower and other (unspecified) personal hygiene items" for six days did not rise to the level of an Eighth Amendment violation), *and Crump v. Janz*, No. 1:10-cv-583, 2010 WL 2854266, at *4–*5 (W.D. Mich. July 19, 2010) (holding that lack of hygiene items and other personal property for 35 days did not establish an Eighth Amendment violation).

O'Neill alleges that each Defendant denied all his requests for personal hygiene items for his entire 264-day stay at the Adams County Jail. (Doc. 20, #83–84 ("At no time would any of the Defendants provide Plaintiff with sanitary eating utensils or the ability to meet all hygiene needs, i.e., shaving, haircuts, tooth paste [sic], toilet paper[,] etc.")). That specifically implicates each Defendant. And the length of that deprivation, which is much closer to the duration of the deprivation in *Flanory* than those in *Siller* and *Crump*, suggests that he was at least potentially exposed to a substantial risk of serious harms like dental health deterioration. Moreover, the risk of such harms arising from extended deprivation of hygiene items is so obvious that Defendants should have known about it. So O'Neill may move forward with this claim.

### iii.    Cell Ceiling Collapse

Beyond that, though, the Supplemental R&R is correct that O'Neill has failed to plead sufficient allegations for any other conditions-of-confinement claim. Start

with his allegation that the cell ceiling collapsed on him. As the Magistrate Judge correctly observes, (Doc. 22, #106), the Third Amended Complaint never alleges that anyone at the Jail knew or should have known that the ceiling was at risk of collapsing. And without such allegations, O'Neill's conditions-of-confinement claim based on that event fails. *Compare Hodge v. Beckstrom*, No. 14-cv-174, 2020 WL 4516828, at *6 (E.D. Ky. Aug. 5, 2020) ("Defendants' testimony clearly establishes notice [as to the risk of the ceiling collapsing]. They have not refuted their own testimony or presented any [contrary] evidence … . Viewing these facts in a light most favorable to Hodge, … Hodge has properly alleged an 8th Amendment claim … ."), *with Bennett v. City of Philadelphia*, No. 07-cv-2794, 2008 WL 4211701, at *7 (E.D. Pa. Sept. 9, 2008) ("Even if the prison conditions were improperly maintained and created a substantial risk of serious harm [when the prison shower ceiling collapsed], plaintiff has not alleged that the individual defendants were aware of the unsafe conditions and deliberately disregarded any potential problems."). So the Court dismisses the conditions-of-confinement claim based on the collapse of O'Neill's cell's ceiling.

### iv.  *Deprivation of a Single Meal*

The Magistrate Judge also correctly concluded that O'Neill has not adequately pleaded his fourth claim based on Defendants' allegedly depriving him of one dinner. (Doc. 22, #104). "[T]he first element of a condition-of-confinement claim requires that the plaintiff show that he or she was subjected to a *substantial* risk of *serious* harm. Denying [even] a few meals over an extended period will generally not suffice to state

a viable claim." *Assi v. Hanshaw*, 625 F. Supp. 3d 722, 746 (S.D. Ohio 2022); *cf. Richmond v. Settles*, 450 F. App'x 448, 456 (6th Cir. 2011) (holding that, in the related Eighth Amendment context, "the withholding of meals, while it may result in some discomfort to the prisoner," does not amount to a constitutional violation when "the prisoner continues to receive adequate nutrition"). Denying a single meal on a single day, absent allegations that the deprivation harmed O'Neill's health, is therefore not enough to support a conditions-of-confinement claim.

### v. Nutritionally Inadequate Meals

The Magistrate Judge is also correct that the fifth and final individual-capacity conditions-of-confinement claim is a non-starter. (Doc. 22, #105). As O'Neill clarified in his objections, he takes issue with the lack of variety in his meal trays. (Doc. 23, #115 ("The food variety was the heart of Plaintiff's complaint.")). But "while Plaintiff may wish the prison menu had more variety, prison food is not required to be tasty or widely varied." *Balcar v. Smith*, No. 3:16-cv-P428, 2017 WL 380931, at *3 (W.D. Ky. Jan. 26, 2017); *cf. Cunningham v. Jones*, 567 F.2d 653, 659–60 (6th Cir. 1977) ("[A] complaint about the preparation or quality of prison food … would generally be far removed from Eighth Amendment concerns."). "Indeed, the Sixth Circuit has held that a diet of solely a food loaf [is not a constitutional violation] … when nutritional and caloric requirements are met." *Balcar*, 2017 WL 380931, at *3 (citing *Payton-Bey v. Vidor*, 68 F.3d 475, 1995 WL 603241, at *1 (6th Cir. 1995) (table)).

O'Neill has not alleged that his health deteriorated because of his diet or that the meal trays did not meet his daily caloric needs. "Thus, Plaintiff's allegations do

not state a constitutional claim because the mere fact that Plaintiff may not have received the types of food he desires does not mean that Plaintiff is denied sufficient food on a daily basis or that he cannot maintain his health based on the diet provided to him." *Id.* The Court therefore dismisses O'Neill's conditions-of-confinement claim based on the alleged inadequately varied meal trays.

*   *   *

In short, of O'Neill's five conditions-of-confinement claims, he has plausibly alleged only the claims based on extended time in isolation housing and extended denial of personal hygiene items. The Court therefore dismisses the other three conditions-of-confinement claims. But it does so without prejudice because O'Neill may be able to remedy the deficiencies by pleading additional factual allegations.

### b.    Deliberate-Indifference-to-Medical-Need Claims

The Court turns next to O'Neill's deliberate-indifference-to-medical-need claims. "Pretrial detainees have a right to adequate medical care under the Fourteenth Amendment. An officer violates that right if that officer shows deliberate indifference to a pretrial detainee's serious medical needs." *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022) (cleaned up) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Greene v. Crawford Cnty.*, 22 F.4th 593, 605 (6th Cir. 2022)). "But there's a bit of a problem in analyzing such claims. Since *Brawner* … changed the traditional test for deliberate indifference claims, district courts have faced conflicting guidance from the Sixth Circuit about the appropriate analytical framework." *Campbell v. Riahi*, No. 1:20-cv-678, 2023 WL 5979211, at *4 (S.D. Ohio

26

Sept. 13, 2023). More specifically, the Sixth Circuit has set forth two tests. Under one framework, adopted in *Trozzi v. Lake County*, 29 F.4th 745 (6th Cir. 2022), a plaintiff must show that "a prison official actually 'knew that [the] failure to respond would pose a serious risk to the pretrial detainee and ignored that risk.'" *Campbell*, 2023 WL 5979211, at *4 (quoting *Trozzi*, 29 F.4th at 757–58). Under the other, adopted in *Helphenstine v. Lewis County*, 60 F.4th 305 (6th Cir. 2023), "'should [have] known' is enough." *Campbell*, 2023 WL 5979211, at *4 (quoting *Helphenstine*, 60 F.4th at 317, and noting that *Helphenstine* rejected *Trozzi* as irreconcilable with *Brawner* and found that *Brawner* controls under the prior panel rule). "Absent clarification, the safest course is perhaps to analyze such claims under both standards, with fingers crossed that they agree. Thankfully, here, they do." *Id.* (footnote omitted).

Applying that framework, the Court agrees with the Supplemental R&R that O'Neill may move forward with these deliberate-indifference claims, (Doc. 22, #110), because all of them survive even the less plaintiff-friendly *Trozzi* standard.

Under *Trozzi*, "a plaintiff must satisfy three elements for an inadequate-medical-care claim under the Fourteenth Amendment": that (1) the detainee had an "objectively serious medical need," (2) "a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm," and (3) "a prison official actually knew that [the] failure to respond would pose a serious risk to the pretrial detainee and ignored that risk." *Trozzi*, 29

F.4th at 757–58. As explained below, here O'Neill's deliberate-indifference claims meet this standard.

### i.  The Finger Injury

Start with the injury to O'Neill's finger. Recall that Jane Doe Nurse examined the finger, which was "purplish dark blue and swollen with puss [sic]," and returned O'Neill to his cell without providing any care. (Doc. 20, #82–83). Shamblin then gave O'Neill a fork and hand sanitizer and told him to "take care of it how you would in your country." (*Id.* at #83).

An extremely discolored, swollen finger is obviously infected and may be seriously injured, thus constituting an objectively serious medical need, which plausibly suggests O'Neill could show the first prong. *Howell v. NaphCare, Inc.*, 67 F.4th 302, 311 (6th Cir. 2023) ("An objectively serious medical need includes conditions that have been diagnosed by a physician as mandating treatment or that are so obvious that even a lay person would easily recognize the necessity for a doctor's attention." (cleaned up)); *cf. Oliver v. Cnty. of Gregory*, No. 3:14-cv-3013, 2016 WL 958171, at *7 (D.S.D. Mar. 8, 2016) ("Oliver's complaints of pain, requests for medical attention, refusal or reluctance to bear weight on his right leg and ankle, and presence of swelling … could cause a reasonable jury to find that Oliver's ankle condition was sufficiently obvious that a layperson would easily recognize the need for medical treatment.").

As to the second prong, the Court can reasonably infer that someone who directly observed a finger in that state would know that leaving such an injury

untreated had the potential to cause serious health problems—thus satisfying the second prong. Yet Jane Doe Nurse, who observed the finger, ignored that risk (if it in fact existed) and declined to provide any care. O'Neill has therefore adequately pleaded (at least at this stage) his individual-capacity deliberate-indifference claims based on his injured finger as to Jane Doe Nurse.

The same ends up being true of his claim against Shamblin—though the route is a little more circuitous. Shamblin came to O'Neill's cell "[l]ater that same day," (Doc. 20, #83)—i.e., *after* Jane Doe Nurse had seen O'Neill—and, presumably, he would have had access to information about Jane Doe Nurse's medical assessment of O'Neill's finger. That presents a bit of a problem for O'Neill. Whether measured under *Trozzi* or *Helphenstine*, "a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he reasonably deferred to a medical professional's opinions." *Greene*, 22 F.4th at 608 (cleaned up). True, "[s]uch deference … may not be absolute or indefinite, particularly when officers are tasked with monitoring a detainee." *Howell*, 67 F.4th at 315; *see also Stojcevski v. Macomb Cnty.*, 827 F. App'x 515, 522 (6th Cir. 2020) ("As one of our unpublished cases summarizes things, an officer who seeks out the opinion of a doctor is generally entitled to rely on a reasonably specific medical opinion for a reasonable period of time after it is issued, absent circumstances such as the onset of new and alarming symptoms." (cleaned up)). But as a general matter, Shamblin could not be liable on a deliberate-indifference theory merely for following Jane Doe's no-treatment advice.

29

Here, though, based on O'Neill's allegations, and drawing all reasonable inferences in his favor, Shamblin did not merely defer to Jane Doe Nurse's medical opinion. Rather, he suggested an independent course of medical action—consisting of a fork and hand sanitizer—that was inconsistent with the nurse's apparent instructions to O'Neill to let the finger injury resolve on its own. If that is true, it at least plausibly suggests that Shamblin may not be able to rely on an argument that he was merely following Jane Doe Nurse's medical advice as a basis for escaping liability on O'Neill's deliberate-indifference claim. Of course, any claim based on Shamblin's alleged medical advice may have problems of proof at multiple levels. But for present purposes, those allegations are enough, if just barely, for this claim to clear the PLRA screening hurdle.

### ii. The Head Injury

Both O'Neill's claims based on his head injury survive, too. He alleges that a 9-inch by 2-inch chunk of the ceiling in his cell, weighing 8–9 pounds, fell on his head, subsequently resulting in his complaining to medical staff of memory loss and balance issues. (Doc. 20, #84). Like an infected or broken finger, a potential head injury followed by problems with memory loss and balance is a serious medical need. That satisfies the first prong at this stage. *Cf. Durley v. Leberak*, No. 22-cv-706, 2024 WL 728246, at *4 (E.D. Wis. Feb. 22, 2024) ("Durley alleges that he fell, hit his head on the door of his cell, and experienced headaches, migraines, and nosebleeds as a result. A reasonable factfinder could conclude that Durley's head injury and symptoms constituted an objectively serious medical need."). And it is reasonable to infer that a

reasonable person, when told (as Big John and Jane Doe Nurse were) that a detainee had been struck in the head by an 8–9-pound cement object, would conclude that the person was at risk of harm to his health. Despite being made aware of this injury, Big John merely told O'Neill to be grateful the rebar had not also fallen on his head. (Doc. 20, #84). And when O'Neill took it upon himself to seek medical treatment, Jane Doe Nurse opted not to treat the injury or to place O'Neill under observation. (*Id.* ("Plaintiff was denied medical attention by Unknown Jane Doe 'Nurse' at that time.")). That's it. Neither took any further action to investigate potential injuries or to treat him.

Moreover, the allegations in the Third Amended Complaint do not suggest that Big John, who "didn't document the incident or file a report of damage," (*id.*), arranged for O'Neill to see any medical care providers. Nor do they suggest that Big John learned that Jane Doe Nurse saw O'Neill and that she decided that no treatment was necessary. Accordingly, Big John cannot rely on (1) having sought medical attention for O'Neill and (2) acting consistently with that medical advice to insulate him from a deliberate-indifference claim. Rather, the allegations here raise a plausible inference that Jane Doe Nurse and Big John independently decided to ignore the risk to O'Neill, which if true plausibly suggests he may be able to satisfy the third prong of the deliberate-indifference standard. So O'Neill has also adequately pleaded his individual-capacity deliberate-indifference claim based on his head injury against both Big John and Jane Doe Nurse.

Again, it may well be the case that Jane Doe Nurse was correct not to provide further treatment or even that, based on additional facts, Big John acted appropriately in not arranging for O'Neill to see a medical provider. But the factual allegations in the Third Amended Complaint, which are all that the Court can consider at this juncture, create a plausible inference that both of these Defendants were deliberately indifferent to a serious risk of harm.

### c.    First Amendment Claims

That brings the Court to O'Neill's First Amendment claims. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ... ." U.S. Const. amend. I. The Fourteenth Amendment renders the First Amendment applicable to the States. *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940). And prisoners retain First Amendment free exercise rights despite their incarcerated status. *Walker v. Mintzes,* 771 F.2d 920, 929 (6th Cir.1985). But "the circumstances of prison life may require some restrictions on prisoners' exercise of their religious beliefs," thus requiring a court to "balance the prisoners' constitutionally protected interest in the free exercise of their religious beliefs against the state's legitimate interests in operating its prisons." *Id.*

"A prisoner alleging ... violat[ions of] his religious beliefs must show that the belief or practice ... is sincerely held. Only after a prison inmate shows a sincere belief that his or her religion requires the practice at issue does the court move on to determining whether the prison's actions restricting the practice are valid." *Barhite*

32

*v. Caruso*, 377 F. App'x 508, 510 (6th Cir. 2010) (cleaned up). Assuming the prisoner clears the sincerely-held-belief hurdle, when "an inmate challenges prison policies under the Free Exercise Clause, Supreme Court precedent instructs us to follow the standard formulated in *Turner v. Safley*, 482 U.S. 78 (1987)." *Maye v. Klee*, 915 F.3d 1076, 1083 (6th Cir. 2019). Under that standard, even if "a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* (quoting *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 349 (1987), which in turn quotes *Turner*, 482 U.S. at 89).

O'Neill raises three First Amendment claims: one for denying him access to a Qur'an and Islamic services, one for including items containing pork on his food tray, and one for forcing him to say he would convert to Christianity to receive adequate meal trays. Reading the allegations in the light most favorable to O'Neill, and therefore determining that O'Neill's Muslim beliefs are sincerely held, the Court agrees with the Supplemental R&R that the first and third claims clear the PLRA screening hurdle. (Doc. 22, #110). But it disagrees with the Supplemental R&R as to the second, (*id.*), and dismisses the food tray claims.

### i.    *Denial of a Qur'an and Islamic Services*

O'Neill alleges that Hayslip, Paul, and Aemeont denied him access to a Qur'an and Islamic services. More specifically, he alleges that Hayslip "denied [him] access to a Qur[']an and Islamic religious services," and that Hayslip, Paul, and Aemeont told him "that he [w]ould [] be permitted to attend [only] Christian services." (Doc. 20, #84).

33

There are two ways of reading O'Neill's allegation that Hayslip denied him access to a Qur'an. One is that the Jail merely declined to provide a Qur'an for O'Neill's use. The other is that it prohibited him from using *any* Qur'an, including his own personal property. The former is a non-starter. *Cf. Cutter v. Wilkinson*, 544 U.S. 709, 720 n.8 ("Directed at obstructions institutional arrangements place on religious observances, RLUIPA[, a statute that expands prisoners' First Amendment rights,] does not require a State to pay for an inmate's devotional accessories."). But the latter—an outright prohibition on his accessing a Qur'an—is enough to state a claim at this stage. *See Martinaj v. Uhler*, No. 9:18-cv-257, 2023 WL 2984449, at *19 (N.D.N.Y. Mar. 13, 2023) ("Refusing to provide Toland with a Quran for the eighteen-day period that he spent at Upstate would constitute a substantial burden on Toland's free exercise rights." (collecting cases)). Because the Court must construe O'Neill's pro se pleadings favorably by drawing reasonable inferences in his favor at this stage, *Keene Grp.*, 998 F.3d at 310, it determines that O'Neill has adequately pleaded his claim for denial of access to a Qur'an.

O'Neill's allegations that Hayslip, Paul, and Aemeont forbade him from attending Islamic religious services and told him he had to attend Christian services are also sufficient to state a claim for relief at this stage of the litigation. *See JCG v. Ercole*, No. 11-cv-6844, 2014 WL 1630815, at *23 (S.D.N.Y. Apr. 24, 2014), ("Plaintiff asserts that Defendant Chill deliberately denied him his right to attend services … for his entire stay at Green Haven. … [T]his is sufficient, albeit barely, at the pleading stage to allege a substantial burden on his beliefs in that he was

34

completely denied any occasion to worship or [to] practice his religion … ."), *report and recommendation adopted by* 2014 WL 2769120 (S.D.N.Y. June 18, 2014).

Defendants may later be able to contest O'Neill's factual allegations or to explain how any restrictions they imposed on him are "reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89. But O'Neill's allegations are enough for his First Amendment claims based on Defendants' denying him access to a Qur'an and Islamic services to clear the PLRA screening hurdle.

### ii.  *Meal Contents*

In contrast, O'Neill's allegations about the contents of his meals fall short. "[P]rison administrators must provide an adequate diet without violating the inmate's religious dietary restrictions. For the inmate, this is essentially a constitutional right not to eat the offending food item. If the prisoner's diet, as modified, is sufficient to sustain the prisoner in good health, no constitutional right has been violated." *Alexander v. Carrick*, 31 F. App'x 176, 179 (6th Cir. 2002) (collecting cases). O'Neill alleges that Hayslip, Aemeont, and Paul "altered [his meal] tray to [include just] cheese sandwiches and pop tarts (which contain pork)." (Doc. 20, #82). Assuming pop tarts do, in fact, contain pork, the question is whether the rest of O'Neill's diet is enough to sustain him in good health. And he has offered no allegations that it was not, or that he suffered health harms from that diet. So this claim does not clear the PLRA screening hurdle. But because O'Neill may be able to remedy this deficiency by pleading additional factual allegations, the Court dismisses it without prejudice.

### iii.    The Conversion Demand

Finally, the Court considers O'Neill's claim arising from Hayslip's and Paul's forcing him to sign a statement that he would convert to Christianity. (*Id.* at #82). Forcing someone to adopt a religion—i.e., "to profess a belief or disbelief in any religion"—is a clear First Amendment violation. *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 15 (1947); *cf. White v. Hamilton Cnty.*, No. 23-5384, 2024 WL 1257508, at *2 (6th Cir. Mar. 25, 2024) (finding that there was a genuine factual dispute as to whether a state trooper forced a driver to agree to be baptized during a traffic stop, such that the baptism amounted to religious coercion). O'Neill's final First Amendment claim therefore also clears the PLRA screening hurdle.

## 3.    Sheriff Rogers

Last, the Court considers O'Neill's remaining allegations about Sheriff Rogers. On this front, the Court agrees with the Supplemental R&R that all the individual-capacity claims against Rogers, other than the claim for denial of personal hygiene items, fail to state a claim on which relief can be granted. (Doc. 22, #103–04). (As discussed above, *see supra* Section B.2.a.ii, the personal-hygiene-items claim can proceed against all Defendants in their individual capacities.)

The Third Amended Complaint alleges that Rogers "is responsible for his employees, the Jail, and the administration of the Jail conditions, regarding safety and sanitation," and that he was "negligent, reckless, wanton, and indifferent" in those responsibilities. (Doc. 20, #80). Both the Third Amended Complaint and O'Neill's Objections to the Supplemental R&R also conclusorily allege that Rogers

personally knew about Jail conditions. (*Id.*; Doc. 23, #113). But O'Neill never alleges that Rogers "did or said anything [specific], or took any [specific] action, or failed to take any [specific] action," *Polachek v. Roberts*, No. 1:22-cv-742, 2023 WL 6348388, at *2 (S.D. Ohio Sept. 28, 2023), beyond denying O'Neill's request for personal hygiene items, which the Court already discussed.

"That matters because the Sixth Circuit has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did that violated the asserted constitutional right." *Id.* (cleaned up). Moreover, because vicarious liability is not a viable legal theory under § 1983, *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009), O'Neill cannot sue Rogers merely based on Rogers' supervising Jail staff. Rather, "[t]o bring a successful suit against [Rogers] as a supervisor, [O'Neill] would need to allege that he 'at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.'" *Polachek*, 2023 WL 6348388, at *2 (quoting *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021)). Conclusorily alleging personal knowledge is insufficient. Accordingly, even if Rogers were aware of conditions at the Jail, O'Neill cannot move forward with any individual-capacity claims against him—other than the claim based on deprivation of personal hygiene items, as mentioned above.

## CONCLUSION

For the reasons detailed above, the Court **REJECTS AS MOOT** the R&R (Doc. 12), **OVERRULES** O'Neill's Objections to the Supplemental R&R (Doc. 23),

and **ADOPTS IN PART** the Supplemental R&R (Doc. 22). As a result, the Court **DISMISSES WITHOUT PREJUDICE** all of O'Neill's official-capacity claims and his individual-capacity conditions-of-confinement claims based on his cell ceiling's collapse, his being denied a single meal tray, and his lacking nutritious food options as he was given meal trays of just cheese sandwiches and pop tarts. The Court also **DISMISSES WITHOUT PREJUDICE** O'Neill's individual-capacity First Amendment claims based on the contents of his meal tray.

That means O'Neill may proceed on the following claims: (1) the individual-capacity conditions-of-confinement claims against Hayslip, Paul, and Aemeont based on extended placement in isolation housing; (2) the individual-capacity conditions-of-confinement claims against all Defendants for their extended denial of personal hygiene items; (3) the individual-capacity deliberate-indifference-to-medical-need claims against Jane Doe Nurse and Shamblin for the injury to O'Neill's finger; (4) the individual-capacity deliberate-indifference-to-medical-need claims against Big John and Jane Doe Nurse for the injury to O'Neill's head; and (5) the individual-capacity First Amendment claims against Hayslip, Paul, and Aemeont based on those Defendants' (a) denying O'Neill access to a Qur'an and Islamic religious services and (b) forcing him to state he would convert to Christianity as a condition of receiving adequate meal trays.

     **SO ORDERED.**

August 12, 2024
_____
**DATE**

_____
**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**